## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **EARL NIX, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 CV 6897** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE,** | ) | |
| | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Earl Nix, Jr. seeks judicial review of a final decision denying his application for

Disability Insurance Benefits and Supplemental Security Income benefits ("disability benefits")

under Titles II and XVI of the Social Security Act.[1] Mr. Nix is seeking a judgment reversing or

remanding the Commissioner's final decision [dkt. 13] and the Commissioner seeks a judgment

affirming his decision. For the reasons set forth below, Mr. Nix's motion is granted [dkt. 13].

## I.      Procedural History

On February 5, 2008, Mr. Nix filed his application for disability benefits alleging a period

of disability beginning December 6, 2007.[2] He alleged neuropathy, diabetes and pancreatic cysts that

resulted in constant pain whether sitting or standing, difficulty walking, and the inability to lift

weights or reach overhead.[3] Mr. Nix's claim was initially denied on March 20, 2008.[4] Mr. Nix then

filed a request for reconsideration on May 15, 2008, which was denied on September 15, 2008.[5] On

---

[1] 42 U.S.C § 405(g).
[2] R. at 40-43, 116-24.
[3] R. at 27-32.
[4] R. at 61.
[5] R. at 65, 69.

1

November 3, 2008, Mr. Nix requested a hearing before an Administrative Law Judge ("ALJ"), which was granted.[6] A hearing took place before ALJ Janice Bruning on January 12, 2010. The ALJ issued an unfavorable decision on March 4, 2008, finding Mr. Nix was not disabled from December 6, 2007 through the date of the decision.[7] Mr. Nix then filed a request for review of the ALJ's decision with the Social Security Appeals Council, which was denied on July 27, 2011.[8] The Commissioner rendered a final decision accepting the ALJ's ruling on Mr. Nix's disability claim.[9] On September 30, 2011, after the Appeals Council granted an extension of time, Mr. Nix filed this action.

## II. Background

Mr. Nix was born on July 15, 1961 and was fifty years old at the time of his application for disability benefits.[10] He stood at six feet, four inches, and weighed 160 pounds.[11] At the time, Mr. Nix's highest level of education was two years of college.[12] Prior to his filing for disability in 2008, Mr. Nix held jobs as a mailroom coordinator and coached basketball as a hobby.[13] The facts set forth below are derived from the administrative record and provide a review of Mr. Nix's medical history, ALJ hearing, and the ALJ's decision.

---

[6]R. at 76.
[7]R. at 47-55.
[8]R. at 6-9.
[9]*Id.*
[10]R. at 121.
[11]R. at 144.
[12]R. at 149.
[13]R. at 34, 25.

**A.      Medical Evidence Prior to February 2008 Disability Filing**

In January 2003, Mr. Nix was treated for hypertension and high blood pressure by Michael G. Dunleavy, D.O., Mr. Nix's primary care physician.[14] In February, Mr. Nix was treated for cellulitis and a bulge in the back of his ankles.[15] In May, blood work by the St. Alexius Medical Center showed that Mr. Nix had chronic elevated blood sugar indicative of diabetes.[16] Dr. Dunleavy placed Mr. Nix on diet restrictions and prescribed medication.[17] In August, Dr. Dunleavy saw Mr. Nix for pain in the abdomen due to cysts forming in the intestines.[18] He also treated Mr. Nix for foot pain, and swelling.[19] In September, Dr. Dunleavy treated Mr. Nix for intestinal cysts resulting in pain in the abdomen, diarrhea, and high blood pressure.[20] In October, Dr. Dunleavy treated Mr. Nix for abdominal pain, and referred him to Melva Cohen, M.D., for an assessment of his abdomen.[21] The assessment of his abdomen revealed an "ascending colon" with moderate chronic inflammation.[22] Dr. Dunleavy treated Mr. Nix in November and December for abdominal pain due to intestinal cysts.[23]

In June 2006, Dr. Dunleavy saw Mr. Nix for possible exposure to a sexually transmitted disease.[24] On September 13, 2006, Mr. Nix was referred by Dr. Dunleavy to spine specialist, Bruce J. Montella, M.D., for evaluation for a fractured clavicle.[25] Dr. Montella reported that Mr. Nix was

---

[14]R. at 302.
[15]R. at 301.
[16]R. at 299-300.
[17]R. at 298.
[18]R. at 296.
[19]R. at 295
[20]R. at 293-94.
[21]R. at 292.
[22]R. at 290.
[23]R. at 285-87
[24]R. at 281.
[25]R. at 280.

showing satisfactory healing.[26] In early September 2007, Mr. Nix was hospitalized for pancreatitis.[27] At a follow up on September 19, 2007, Dr. Dunleavy noted that Mr. Nix was suffering from acute pancreatitis, sudden onset inflammation of the pancreas,[28] diabetes mellitus ("DM") Type II, insufficient secretion of insulin,[29] and mixed hyperlipidemia, elevated concentration of fat in the blood stream.[30] Based on his analysis, Mr. Nix was restricted from work until October 15, 2007.[31]

On October 10, 2007, Mr. Nix was treated for difficulty sleeping and tenderness or pain in the abdomen.[32] Dr. Dunleavy noted the patient's condition as gradually "improving" but that Mr. Nix "still had pain" and "difficulty sleeping."[33] On October 19, 2007, an x-ray of the abdomen by Bennett S. Park, M.D., revealed acute pancreatitis and Dr. Dunleavy restricted Mr. Nix from work until November 13, 2007.[34] At a follow-up on October 24, 2007, Dr. Dunleavy assessed Mr. Nix as having unspecified anemia, acute pancreatitis, and uncontrolled diabetes.[35] For his pancreatitis, Mr. Nix was referred to Asad Aziz, D.O.[36] He was also advised to restrain from work through November 11, 2007.[37]

On October 30, 2007, Mr. Nix was treated by Dr. Aziz who found an impression of "acute pancreatitis with pseduocyst development," abnormal cell growth on the colon, inflamation of the digestive tract, and weight loss.[38] The doctor also noted that Mr. Nix had a history of alcohol abuse

---

[26] R. at 280.
[27] R. at 211-12.
[28] *Dorlands Illustrated Medical Dictionary*, 1367 (32nd ed. 2012).
[29] *Id.* at 506.
[30] *Id.* at 890; R. at 211-12.
[31] R. at 211-12.
[32] R. at 276-77.
[33] R. at 209.
[34] R. at 205-08.
[35] R. at 205-06.
[36] *Id.*
[37] *Id.*
[38] R. at 203-04.

and advised him to stop drinking.[39] In November, Dr. Dunleavy met with Mr. Nix and assessed him as having cellulitis, "abscess of unspecified sites," and ear swelling.[40] In December, Dr. Dunleavy found Mr. Nix had inflammation of a single nerve, uncontrolled diabetes, acute pain, cellulitis, pancreatic cysts, and skin tissue disturbances and was once more restricted from work.[41]

In January of 2008, Andrew Gordon, M.D., conducted a nerve study test on Mr. Nix which came back abnormal with an impression of axonal nerve damage affecting the lower extremities.[42] An evaluation by Diabetes Specialist, L. Fernando Soruco, M.D., on January 21, 2008, showed an impression of diabetes "most likely with significant insulin deficiency" and a "random Accu-Chek of 250."[43] Dr. Soruco also found severe painful neuropathy with marked weight loss and muscle wasting.[44] He also believed Mr. Nix to likely have amyotrophic diabetic neuropathy ("instead of affecting the ends of nerves, like peripheral neuropathy, diabetic amyotrophy affects nerves in the thighs, hips, buttocks or legs").[45] On January 28, 2008, Mr. Nix next met with neurologist V.K. Gupta, M.D., who assessed him as having painful symmetrical peripheral neuropathy and diabetes most likely caused by alcohol abuse.[46] Dr. Gupta conducted a motor examination, finding his motor was 5/5 throughout (normal), there was atrophy of the muscles of the feet and calves, pain in both ankles, and a "normal-based" gait.[47] The doctor noted that Mr. Nix claimed to feel "unsteady when closing his eyes."[48] The sensory examination revealed that Mr. Nix had decreased sensations to

---

[39] R. at 203-04.
[40] R. at 199-200.
[41] R. at 260-65.
[42] R. at 335-36.
[43] R. at 333-34, Accu-Check, *Blood Sugar Monitoring System,* http://www.accu-check.com (250 Accu-Check level is a high reading).
[44] R. at 333-34
[45] *Id.*; MayoClinic, http://www.mayoclinic.com/health/diabetic-neuropathy/ds01045/dsectionsymptoms.
[46] R. at 256-57.
[47] *Id.*
[48] *Id.*

pinprick and touch up to the ankles in the lower extremities, and in the fingers of the upper extremities.[49] Dr. Gupta also noted a decreased in vibratory sensations.[50]

## B.    Medical Evidence After February 2008 Disability Filing

On February 7, 2008, Dr. Dunleavy filled out an attending physician statement for a long term disability claim, listing Mr. Nix's diagnoses as painful neuropathy and diabetes.[51] Due to the conditions and the increasing dosages of pain medication necessary to treat his conditions, Dr. Dunleavy concluded that Mr. Nix would be unable to safely perform his job.[52] In terms of patient capability, the doctor listed that Mr. Nix could sit for up to four hours, stand intermittently up to two hours, and walk intermittently up to two hours.[53] Mr. Nix could also reach above shoulder level, operate a motor vehicle, and lift up to ten pounds frequently with no pulling or pushing capabilities.[54] On February 12, Dr. Dunleavy treated Mr. Nix for DM, mononeuritis, inflammation of a single nerve,[55] and "pain in joint involving ankle and foot."[56] On February 18, 2002, Dr. Soruco reevaluated Mr. Nix and found his diabetes had improved and was controlled by medication, and his neuropathy was improved.[57] The doctor prescribed a higher dose of medication for his neuropathy.[58] In March and April, Dr. Dunleavy treated Mr. Nix for unspecified blepharitis, inflammation of the eyelids,[59] and nerve pain associated with diabetes.[60]

---

[49]R. at 256-57.
[50]*Id.*
[51]R. at 379-82.
[52]*Id.*
[53]*Id.*
[54]*Id.*
[55]*Dorlands* at 1177.
[56]R. at 254-55, 186.
[57]R. at 224
[58]*Id.*
[59]*Dorlands* at 225.
[60]R. at 251-52, 249-50.

On March 14, 2008, Frank Jimenez, M.D., in his capacity as medical consultant for the Social Security Administration, performed a Physical Residual Functional Capacity ("RFC") Assessment on Mr. Nix. Dr. Jimenez assessed Mr. Nix as being able to occasionally carry twenty pounds, frequently carry ten pounds, stand or walk for about six hours a day, sit with normal breaks for about six hours, and push or pull but was unable to climb ladders, ropes and scaffolds.[61]

On June 16, 2008, Dr. Dunleavy assessed Mr. Nix as having nerve pain associated with diabetes.[62] Dr. Dunleavy noted that Mr. Nix's gait was "limping, slow and cautious."[63] He filled out a second attending physician statement for long term disability on June 17, noting that Mr. Nix's pain had moved to his arms, which prevented Mr. Nix from safely performing his job.[64] He further opined that Mr. Nix could sit for a maximum of four hours and stand or walk for a maximum of two hours, all intermittently.[65] Mr. Nix could lift up to ten pounds frequently, and up to twenty pounds occasionally.[66] On June 21, Dr. Dunleavy treated Mr. Nix for inflammation of the eyelash follicles and nerve pain associated with diabetes.[67]

On September 12, 2008, Charles Kennedy, M.D., in his capacity as state consultant, reviewed and affirmed Dr. Jimenez's residual function capacity test in light of additional evidence from Dr. Dunleavy.[68] In October, Dr. Dunleavy filled out a physician's evaluation indicating that Mr. Nix's ability to sit, stand or walk had deteriorated to less than two hours with normal breaks, and Mr. Nix would be required to take up to eight five-minute breaks per eight hour work day, and

[61]R. at 251-52, 249-50.
[62]R. at 247.
[63]Id.
[64]R. at 406-07.
[65]Id.
[66]Id.
[67]R. at 250.
[68]R. at 434-36.

be absent from work more than four days a month.[69] He relied on the EMG nerve study test which found motor degeneration of the axonal nerves in Mr. Nix's lower extremities.[70] Dr. Dunleavy noted that Mr. Nix's pain had progressed to the point of hypersensitivity to the slightest stimulant, making it impossible for Mr. Nix to work.[71]

On June 13, 2009, Mr. Nix was admitted to St. Alexius Medical Center reporting pain, nausea and vomiting.[72] Yelena Shanchuk, M.D., noted in her discharge diagnoses that Mr. Nix suffered from recurrent pancreatitis, diabetes, high fat levels in the blood, and high blood pressure.[73] She also assessed that Mr. Nix had abdominal pain "secondary to pancreatitis" and atypical chest pain.[74] Dr. Shanchuk noted Mr. Nix was discharged with pain and insulin medication.[75] Victoria Marsik-Castillo, M.D., performed an abdominal ultrasound on Mr. Nix's upper body, and found no abnormalities in the liver, pancreas or gallbladder.[76] David Albritton, M.D., did a comparison of Mr. Nix's abdomen and pelvis to a 2007 study and found mild pancreatitis and bulging sacs in the colon.[77] Shilpa Mehta, M.D., examined Mr. Nix and found no evidence of bowel obstruction.[78] Carl Albun, M.D., examined Mr. Nix for pancreatitis, and made an impression of pancreatitis and high blood levels of fat production.[79] In August 2009, Dr. Dunleavy examined Mr. Nix and found pain in the lower extremities, and uncontrolled diabetes with nerve pain.[80]

---

[69]R. at 440-43.
[70]*Id.*
[71]*Id.*
[72]R. at 453.
[73]*Id.*
[74]R. at 453-54.
[75]R. at 452.
[76]R. at 447.
[77]R. at 448.
[78]R. at 450-51.
[79]R. at 455-56.
[80]R. at 466-67.

## C.    The January 12, 2010 Hearing

Mr. Nix's hearing before the Social Security Administration took place on January 12, 2010 in Oak Brook, Illinois.[81] ALJ Janice Bruning conducted the hearing.[82] The Vocational Expert ("VE") testifying was Aimee Mowery.[83] At the hearing, Mr. Nix responded to questions by the ALJ, stating that he currently lived with his mother and niece who took care of him and assisted him with daily tasks like cooking and cleaning.[84] When asked about his ability to sit and stand for prolonged periods, Mr. Nix stated that he could only stand for ten minutes before having to sit down, and sit for about ten minutes before having to stand.[85] When questioned on his ability to use his muscles, Mr. Nix stated that it was difficult for him to perform simple tasks like dressing, washing dishes and shaving, and that his family usually helped him.[86] He testified that he could not lift fifteen pounds (had dropped a fifteen pound weight on his foot), did not climb stairs at his house, had difficulty with balance, and could not crouch or reach overhead.[87]

In response to the ALJ's questions about his use of a cane, Mr. Nix stated that he was prescribed a cane, but did not have it with him because he had left in a hurry for the hearing.[88] In response to questioning about his sleep at night, Mr. Nix stated that due to his use of five different medications, he was "pretty much asleep all the time."[89] When asked to describe a typical day, Mr. Nix stated that he was "up and down all night, all day," and that ninety percent of the day, he was sitting on the couch watching TV or asleep.[90] In response to follow-up questioning by his attorney about the side-

---

[81]R. at 21-23.
[82]*Id.*
[83]*Id.*
[84]R. at 24-32.
[85]R. at 27.
[86]R. at 29.
[87]R. at 27-28.
[88]R. at 28.
[89]*Id.*
[90]R. at 31.

effects of his medication, Mr. Nix stated that his hands sometimes became jittery and swollen after taking the medication, and that it negatively affected his kidneys.[91] Mr. Nix also stated that he had depression, but was not seeing anyone for it due to lack of medical coverage.[92] In response to the attorney's questioning, Mr. Nix stated that he'd been receiving long term disability for the past two years.[93]

The VE, Aimee Mowery, testified next.[94] She classified Mr. Nix's prior work experience as a mailroom coordinator as having a light strength level.[95] The ALJ asked the VE to consider an individual with Mr. Nix's age, education, and work experience, who could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk at least six hours during an eight hour workday, sit at least six hours during an eight hour workday, occasionally balancing, stooping, crouching, kneeling and crawling, and who has limited exposure to heights and moving machinery.[96] The VE stated that such an individual would be able to perform the past work of Mr. Nix, and the positions of mailroom clerk, and other unskilled, light level jobs like cashier, counter or rental clerk, and retail clerk.[97]

The ALJ then asked the VE to consider an individual who could lift ten pounds occasionally, less than ten pounds frequently, stand and/or walk for two hours during an eight hour workday, sit at least six hours during an eight hour workday with a sit/stand option at will, allowing for a change of position every forty-five minutes, with limited exertion capabilities, and limited exposure to

---

[91]R. at 31-33.
[92]*Id.*
[93]*Id.*
[94]R. at 33.
[95]R. at 34.
[96]R. at 34-38.
[97]*Id.*

heights and machinery.[98] The VE stated that such an individual would be able to do three sedentary jobs: order clerk, information clerk, and inspector/check weigher.[99] If the individual could only use his hands occasionally for handling, fingering and feeling, the VE stated that none of the previous would apply but that the job of call out operator would be applicable to such an individual.[100] The ALJ then asked how many jobs would be available if the individual is limited to simple, repetitive tasks with no more than three steps, to which the VE responded that the job of call out operator and inspector/check weigher would remain.[101]

In response to questioning by Mr. Nix's attorney, the VE testified that for all the jobs she had listed, absence of less than one day per month would be tolerated.[102] Using Dr. Dunleavy's October evaluation, with the individual being able to walk less than a block, stand/walk or sit for less than two hours, take about eight breaks of five minutes per eight hour workday, the VE stated that such an individual would be precluded from work.[103]

## D.     The ALJ's Decision

In her decision on March 25, 2010, ALJ Janince Bruning ruled that Mr. Nix was not disabled.[104] The ALJ found Mr. Nix to have severe diabetes, peripheral neuropathy and episodes of pancreatitis, but decided that these conditions did not meet or equal a listed impairment.[105] In reaching her decision, the ALJ followed the five-step sequential evaluation process of 20 C.F.R. § 404.1520(a).[106] An ALJ must consider: (1) whether the claimant is currently engaged in substantial

---

[98]R. at 34-38.
[99]*Id.*
[100]R. at 37.
[101]*Id.*
[102]R. at 38.
[103]*Id.*
[104]R. at 47.
[105]R. at 49.
[106]R. at 49.

gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment is so severe as to meet or equal any listing in the regulations; (4) whether the claimant is able to return to her prior work considering her residual functioning capacity; and (5) whether the claimant is unable to hold any job tailored to claimant's age, education, and past work experience.[107] Affirmative answers at steps three and five require a rendering of disability, while negative answers at any step except three requires finding a non-disabling condition.[108] As a perquisite, the ALJ noted that Mr. Nix met the insurance requirements of the Social Security Act through December 31, 2011.[109]

First, the ALJ found that Mr. Nix had not engaged in substantial gainful activity since December 6, 2007 as per 20 C.F.R. § 404.1520(b).[110] Second, the ALJ accepted that Mr. Nix suffered from Type II diabetes with nerve damage affecting the lower extremities, and pancreatitis.[111] The ALJ acknowledged that these impairments are severe under 20 CFR 404.1520(c) because they significantly affected Mr. Nix's ability to do work, and have lasted or are expected to last at least twelve continuous months.[112] The ALJ next acknowledged Mr. Nix's claim of depression, and determined that Mr. Nix's depression was non-severe because no objective evidence existed to suggest that Mr. Nix suffered from such a condition.[113] She reasoned that Mr. Nix never tried to get treatment for any mental impairment, and the only evidence suggesting a mental condition was Mr. Nix's history of alcohol abuse.[114]

---

[107]20 C.F.R. §§ 404.1520, 416.920.
[108]Id.
[109]Id.
[110]Id.
[111]R. at 49.
[112]Id.
[113]Id.
[114]R. at 49.

Third, the ALJ determined that Mr. Nix did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R. § 404.[115] She analyzed whether Mr. Nix suffered from Listing 9.08 (now 9.00) Diabetes Mellitus.[116] To meet the listing, the medical record must contain evidence of diabetes mellitus with (A) neuropathy, which is defined as "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station;" or (B) increased acidity in body tissue occurring at least once every two months; and (C) inflammation of the retina.[117] In reaching her conclusion, the ALJ noted that Mr. Nix went for a nerve test in January 2008, which confirmed "axonal neuropathy," disruption of nerve function affecting Mr. Nix's lower extremities, and five months later Dr. Dunleavy recorded Mr. Nix's gait as "limping, slow and cautious." The ALJ then discussed the June 2008 reports, where Mr. Nix spoke of pain in his hands, but "four months later...a residual functional capacity questionnaire by Dr. Dunleavy . . . did not report the claimant experienced neuropathic pain in his upper extremities, [and that] claimant had no significant limitations reaching, handling, or fingering."[118] Further, the ALJ found no evidence in the medical record of tissue acidity or inflammation of the retina. As such, the ALJ found that Mr. Nix's impairments, although severe, did not fulfil the listing requirements.

Fourth, the ALJ determined, based on her interpretation of the evidence and credibility findings, that Mr. Nix had the RFC to perform sedentary work as per 20 C.F.R. § 404.1567(a) and 20 C.F.R. § 416.967(a), with limitations.[119] Sedentary work " involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small

---

[115]R. at 49-50.
[116]R. at 50.
[117]*Id.*
[118]*Id.*
[119]R. at 50.

tools."[120] The ALJ found that Mr. Nix can lift a maximum of ten pounds; occasionally lift or carry docket files, ledgers and small tools; stand/walk for no more than two hours in an eight hour day; sit for no more than six hours subject to an exertional limitation that Mr. Nix alternate between sitting and standing every forty-five minutes; reach overhead bilaterally occasionally; grip, finger or handle frequently; and work in an environment with limited exposure to hazards like heights and moving machinery.[121] In reaching this assessment, the ALJ considered all symptoms to the extent that they could be reasonably accepted as consistent with the objective medical evidence.[122]

The ALJ noted that Mr. Nix claimed to (1) be unable to walk a block, but did not bring his cane to the hearing; (2) have difficulty sitting for more than ten minutes at a time, but sat for more than twenty minutes for the hearing without visibly displaying any pain; (3) have difficulty using his hands, but continued to purchase cigarettes; (4) be unable to afford mental health insurance, yet continued to buy cigarettes.[123] Also, she noted that Mr. Nix received disability insurance through June 2009 but there was no evidence that he used the any of the money towards his mental health treatment.[124] Based on her assessment, the ALJ found Mr. Nix had the RFC to perform sedentary work lifting no more than ten pounds, standing or walking for no more than two hours in an eight hour day, sitting for no more than six hours, and occasionally reaching overhead.[125]

Lastly, the ALJ found that Mr. Nix could not perform any of his past work due to the skill level necessary.[126] Considering Mr. Nix's age, education, work experience and RFC, in addition to the VE testimony, the ALJ found that Mr. Nix could perform the "unskilled" work of an order clerk,

---

[120]20 C.F.R. § 404.1567(a).
[121]*Id.*
[122]*Id.*
[123]R. at 52.
[124]*Id.*
[125]R. at 48-50.
[126]R. at 53.

information clerk, and inspector.[127] As such, the ALJ found Mr. Nix was not disabled under sections 216(I) and 223(d) of the Social Security Act.

## III.    Standard of Review

Where an Appeals Council has denied review of the ALJ's decision, the Court reviews the ALJ's decision as that of the Commissioner.[128]  Under 405(g) of the Social Security Act, a district court reviews an ALJ's decision *de novo* for conclusive findings of law, and gives deference to the ALJ's factual findings if supported by substantial evidence.[129] Substantial evidence is such evidence as a reasonable person would accept as adequate to support a conclusion.[130]  To determine the strength of substantial evidence, the court must weigh the evidence that supports the ALJ's conclusion and any evidence that fairly detracts from its weight.[131] It may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations.[132]" The ALJ must provide evidence that shows a "logical bridge" between the evidence and the conclusion that claimant is not disabled such that a reviewing court may assess the validity of the findings.[133]

---

[127]R. at 54.
[128]*Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).
[129]*Mason v. Barnhart*, 325 F. Supp. 2d 885 (E.D. Wis. 2004).
[130]*Richardson v. Perales*, 402 U.S. 389, 399-400 (1971).
[131]*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 388 (7th Cir. 1992).
[132]*Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).
[133]*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2007) (citing *Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004)).

## IV.    Analysis

Mr. Nix argues that the ALJ's decision must be reversed or remanded because the ALJ erred by (1) mis-applying the Diabetes Mellitus Listing; (2) improperly weighing the objective medical evidence in the record; (3) erroneously discrediting his credibility relating to his subjective complaints; and (4) erroneously finding that there were jobs available to him in step five.

## A.    The ALJ's assessment of Diabetes Mellitus Listing was erroneous.

The first issue presented by Mr. Nix is whether the ALJ erred in determining that he did not meet the listing for Diabetes Mellitus.[134] He contends that the ALJ failed to consider substantial evidence in the medical record of sensorimotor axonal polyneuropathy ("neuropathy") in both the legs and arms.[135] Additionally, Mr. Nix argues that the ALJ failed to consider whether his various symptoms satisfied the Listing in the aggregate.[136] Mr. Nix contends that the ALJ should have re-contacted Mr. Nix's treating physician or obtained the opinion of a medical expert before making his findings.[137]

The Commissioner responds that "the ALJ reasonably considered" the evidence in finding that none of Mr. Nix's symptoms satisfied the Listing requirements.[138] Specifically, he points out that the ALJ referenced both the neuropathy diagnosis and Mr. Nix's gait in the opinion.[139] He further argues that the ALJ considered the spectrum of Mr. Nix's complaints before deciding that he could perform sedentary work.[140] He contends that since the ALJ's decision was not ambiguous

---

[134]Pl. Mot at 8-10, dkt. 14.
[135]*Id.*
[136]*Id.* at 10.
[137]*Id.* at 8.
[138]Def. Mot. at 5, dkt. 20.
[139]*Id.*
[140]*Id.* at 6.

or based on inadequate evidence, that the ALJ need not have contacted either the treating physician or a ME.[141]

In evaluating this issue, we first clarify the Listing requirements. Both sides agree that the ALJ applied the correct Listing in her decision, Listing 9.08 for Diabetes Mellitus.[142] They further agree that the Listings have been revised by the SSA and that the current Listing for Diabetes Mellitus is 9.00(B)(5)(a)(ii), which must be read in conjunction with Listings 11.14 and 11.04(B).[143] Both the old and new listings must be read in conjunction with Listing 11.00(C).[144] Rather than reproducing the listings here, we summarize how the listings apply to Mr. Nix's case.

Under the listing, Mr. Nix can be found disabled if he suffers from: (1) neuropathy that led to a significant and persistent disorganization of motor function (including sensory disturbances, *i.e.* pain) in his arms that resulted in sustained disturbance of gross and dexterous use of his fingers, hands, and arms; (2) neuropathy that led to a significant and persistent disorganization of motor function (*i.e.* pain) in his legs that resulted in sustained disturbance of locomotion; (3) neuropathy that led to a significant and persistent disorganization of motor function (*i.e.* pain) in his legs that resulted in sustained disturbance of gait and station.[145] This interpretation of the Listings is supported by our review of cases from multiple circuits.[146]

To simplify, the Listings can be paraphrased as: neuropathy that leads to pain in either the (1) arms, significantly interfering with use of the fingers, hands, and arms; (2) legs, significantly

---

[141]Def. Mot. at 6.
[142]Pl. Mot. at 6; Def. Mot. at 4.
[143]*Id.*
[144]*Id.*
[145]20 C.F.R. § 404 App. 1.
[146]*Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989); *Brown v. Astrue*, 280 Fed. Appx. 872, 877, Footnote 2 (11th Cir. 2008); *Gambil v. Bowen*, 823 F.2d 1009, 1013 (6th Cir. 1987); *Villareal v. Barnhart*, 51 Fed.App. 483, footnote 6 (5th Cir. 2002)

interfering with the ability to move around; (3) legs, significantly interfering with one's gait or ability to stand. The issue, then, is whether the ALJ properly considered each of these factors and supported them with substantial evidence from the medical record.

To properly consider the factors, the ALJ need not mention all of the evidence in the record, but may not ignore an entire line of evidence contrary to her finding.[147] If there are multiple impairments, the ALJ must consider them in combination as well as individually.[148] We affirm an ALJ's decision if it is supported by substantial evidence and the decision is well explained.[149] In the present case, we consider whether the ALJ has properly considered the factors of the Diabetes Mellitus listings in the following order: (1) pain in Mr. Nix's legs interfering with gait and station, (2) pain in his arms, then (3) pain in his legs interfering with his ability to move around.

### 1. Legs as related to gait and station

The ALJ noted that Dr. Dunleavy noted that Mr. Nix's "gait was 'limping and [s]low and cautious.'"[150] Later, when evaluating Mr. Nix's credibility, the ALJ points out that while he testified that he could not walk one block without his cane because of problems with his balance, he did not bring the cane to the hearing.[151] While the Seventh Circuit has expressed its discomfort with the "sit and squirm" test, it has nonetheless "endorsed the role of [the ALJ's] observation [during the hearing] in determining credibility."[152] The ALJ's observation is certainly relevant to the ALJ's step two finding that Mr. Nix's gait and station were not indicative of "significant and persistent

---

[147]*Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).
[148]*Id.*
[149]*Id.* at 591, 592.
[150]R. at 50.
[151]R. at 50-51.
[152]*Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000).

disorganization of motor function" in his legs resulting in sustained disturbance of his gait.[153] In addition to the "limping and slow and cautious" evidence and the cane evidence, the ALJ also points out that Dr. Gupta noted that Mr. Nix had a normal gait (we recognize that Dr. Gupta actually said "normal-based" gait, not "normal" gait). Considering the ALJ's reasoning together with and the evidence from the entire record, we hold that the ALJ's finding regarding this particular part of the listings was supported by substantial evidence.

### 2. Arms

In determining that Mr. Nix's neuropathy was not demonstrated by significant and persistent disorganization of motor function in his arms, resulting in sustained disturbance of gross and dexterous movements, the ALJ reasoned that Mr. Nix:

> reported experiencing pain in his hands in June 2008, but four months later in a peripheral neuropathy RFC questionnaire completed by Dr. Dunleavy, the physician did not report [that Mr. Nix] experienced neuropathic pain in his upper extremities and reported that [he] had no significant limitations reaching, handling or fingering.[154]

Mr. Nix argues that this ignored a line of evidence that favored a finding of disability and that the ALJ should have either re-contacted Dr. Dunleavy to clarify whether Mr. Nix was restricted in terms of pushing/pulling and lifting, or alternatively should have called upon the services of a medical expert to help make this determination.[155] To the point that the ALJ ignored a line of evidence, Mr. Nix first refers to a letter by Dr. Gupta, which states that Mr. Nix complained of "some numbness and tingling in his hands and fingertips" and that "sensations are decreased to pinprick, touch and pinprick in the . . . fingers in the upper extremities."[156] Mr. Nix states that Dr. Gutpa noted the

---

[153]R. at 49.
[154]R. at 50
[155]Pl. Mot. at 8.
[156]R. at 183-84.

impression of painful symmetric peripheral neuropathy "in the *hands, fingertips and feet*."[157] However, no such finding appears in the letter. Next, Mr. Nix points to Dr. Soruco's January 21, 2008 letter.[158] But that letter also does not address any arm issues. Next, he cites to Dr. Soruco's treatment notes from Mr. Nix's January 18, 2008 visit, which do not appear to specifically address any arm-related neuropathy.[159] Next, Mr. Nix cites to Dr. Dunleavy's treatment notes, but these, once again, refer only to Mr. Nix's own subjective complaints of hand pain.[160]

We find that the ALJ did not ignore significant evidence in coming to her decision regarding the disorganization of motor function in Mr. Nix's arms. The evidence Mr. Nix points to does not mention neuropathy in his arms, let alone that it was disabling. The RFC questionnaire that Dr. Dunleavy completed, which the ALJ bases her finding on, clearly indicates that Mr. Nix does not have significant limitations with reaching, handling, or fingering.[161] Further more, Dr. Jimenez's RFC determination came to the same conclusion.[162] As such, we find that the ALJ did not err in this part of applying the Listing requirement.

### 3. Legs as related to moving around

Here, the ALJ stated that Mr. Nix "underwent an electromyography/nerve conduction [] study in January 2008 that showed sensorimotor axonal polyneuropathy affecting his lower extremities bilaterally" but does not consider the effect of this evidence other than in relation to Mr. Nix's gait.[163] In her credibility determination, the ALJ acknowledged that Mr. Nix sought treatment

---

[157]Pl. Mot. at 9.
[158]*Id.*; R. at 186-87.
[159]Pl. Mot. at 9; R. at 228.
[160]Pl. Mot at 9; R. at 247.
[161]R. at 442.
[162]R. at 241.
[163]R. at 50.

for his leg pain, the results of the EMG test showed neuropathy affecting his legs, and that he had some decrease to the touch and pinprick sensations in his feet.[164] She then counters this evidence by stating that "[a]trophy of the muscles of [Mr. Nix's] feet and calves was noted, but his muscle tone was normal and muscle strength was rated at 5/5 in all of his extremities."[165] She then discredits Dr. Dunleavy's opinions regarding the severity of Mr. Nix's legs pain because the opinions were based on Mr. Nix's own subjective complaints.[166]

We find that the ALJ failed to address substantial evidence in coming to her determination for two reasons. First, she used evidence regarding Mr. Nix's musculoskeletal strength to justify that he did not meet a neurological Listing (Listing 11.00). She was not analyzing Mr. Nix's pain under Listing 1.00, which covers the musculoskeletal system. Therefore, we find it arbitrary to refer to Mr. Nix's muscle tone. Second, although Mr. Nix reported severe pain to Dr. Dunleavy, Dr. Dunleavy also referred Mr. Nix to specialists, who made independent findings that Mr. Nix suffered from neuropathy,[167] "severe painful neuropathy,"[168] "painful symmetrical peripheral neuropathy,"[169] and "severe painful neuropathy." [170] The ALJ referred to these reports in regards to Mr. Nix's hands, but ignores the reports in relation to his legs. The case, therefore, must be remanded for the ALJ to re-evaluate whether Mr. Nix suffered from neuropathy that led to a significant and persistent disorganization of motor function (*i.e.* pain) in his legs that resulted in sustained disturbance of locomotion. It is for the ALJ to determine whether she should call upon the opinion of a ME.

---

[164]R. at 52.
[165]*Id.*
[166]*Id.*
[167]R. at 192.
[168]R. at 190.
[169]R. at 184.
[170]R. at 186.

### 4. Symptoms in aggregate

Mr. Nix claims that the ALJ did not consider the aggregate effect of all his impairments (namely: his severe insulin deficiency, GERD, high cholesterol, hypertension, blepharis, allodynia, and hypertriglyceridemia) when undertaking his step three analysis.[171] As long as the ALJ considered the impairments elsewhere in her findings, it satisfies the ALJ's requirement that she "consider the aggregate effect" of his impairments. In other words, the requirement is not confined to step three.[172] We do not find anything in 20 C.F.R. § 141.1523, to which Mr. Nix cites, that dictates otherwise. It should also be noted that whether the ALJ considered the conditions and whether the ALJ substantively came to the right outcome are separate issues. Here, we consider only the former.

During step two, the ALJ found that "there is no objective evidence that [Mr. Nix's] alleged depression has imposed any limitation on [his] ability to perform work-related activities."[173] In step three, she evaluates Mr. Nix under listing 9.08, which indicates that she has considered the fact that Mr. Nix suffers from diabetes (severe insulin deficiency).[174] We have already addressed the ALJ's treatment of neuropathy in step three. The ALJ then states that she has considered "all symptoms" and goes on to discuss his pancreatitis and complaints of pain.[175] Essentially, Mr. Nix is arguing that the ALJ did not consider his reflux (GERD), high cholesterol, hypertension, blepharis, allodynia, and hypertriglyceridemia in her determination that Mr. Nix was not disabled. Upon remand, the ALJ

---

[171]Pl. Mot. at 10.

[172]*See Castille v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (finding that "the ALJ needed to consider the aggregate effect of the entire constellation of ailments" and noted "[a]ccordingly, in step four of the evaluation, the ALJ properly considered [the claimant's] severe and non-severe impairments."

[173]R. at 49.

[174]R. at 49-50.

[175]R. at 51.

could easily clarify whether these symptoms, in addition to any pain in Mr. Nix's hand and legs, or issues with his gait, combine to equal the Listing requirement.

**B.      The ALJ did not err in weighing the evidence.**

Next, Mr. Nix argues that the ALJ failed to properly weigh and consider the evidence when making his RFC determination.[176] He raises multiple issues within the arguments, including that the ALJ erred in: (1) ignoring objective evidence of pain in discrediting the treating physician's opinions regarding Mr. Nix's pain, reasoning that the opinions were based on Mr. Nix's subjective complaints, (2) determining, in absence of medical evidence, that his pancreatitis resolved quickly with treatment; and (3) determining that Mr. Nix's gait was normal, based on the medical evidence.[177]

We already resolved Mr. Nix's first argument regarding his objective medical evidence of pain. Regarding the pancreatitis, the Commissioner cites multiple pieces of evidence in the record that show that Mr. Nix's pancreatitis did repeatedly improve with treatment.[178] The Commissoner further argues that Mr. Nix is unable to fulfill his duty to demonstrate that his pancreatitis is disabling.[179] We agree. Mr. Nix states that "the record is devoid of any mention that [his] pancreatitis resolved quickly,"[180] but this is not true. For example, Dr. Soruco's January 21, 2008 letter states "his pancreatitis has resolved."[181] (Although it does not state "resolved quickly," we infer that the pancreatitis resolved normally). The Commissioner points to four instances in the record where Mr. Nix's pancreatitis was documented as improved,[182] two of which the ALJ cites.[183] Although the ALJ

---

[176]Pl. Mot. at 10.
[177]*Id.* at 10-13.
[178]Def. Mot. at 10.
[179]*Id.*
[180]Pl. Mot at 11.
[181]R. at 189.
[182]Def. Mot at 10, dkt. 20.
[183]R. at 51.

does not explain in great detail how the pancreatitis was resolved as the Commissioner does, she is not required to discuss every piece of evidence in the record.[184] We must affirm if it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[185] We find that it is.

In arguing that the ALJ erred in finding that his gait was normal, Mr. Nix cites to a treatment note by Dr. Dunleavy and laboratory results that he suggests indicate that his gait worsened over time.[186] The Commissioner responds that the same evidence does not suggest that Mr. Nix's gait worsened over time.[187] The evidence is such that reasonable minds could differ. As such, it is the ALJ's role to weigh the evidence and we are not permitted to reweigh it.[188] Here, the ALJ found that the evidence suggested that Mr. Nix's gait did not satisfy the Listing requirement. This conclusion was supported by substantial evidence.

## C.  The ALJ's credibility determination was erroneous.

Mr. Nix next argues that the ALJ erred in finding that his subjective complaints of pain were not credible because of: (1) his failure to bring his cane to the hearing, (2) his ability to use his hands to smoke cigarettes, and (3) his ability to sit through the hearing.[189] He also argues that the ALJ erred in finding that his failure to seek psychiatric treatment was indicative of not being depressed. Finally, he take issues with the ALJ's finding that he "contradicted his own testimony" by claiming to be "up and down" all night while at the same time claiming to be sleepy because of his

---

[184]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).
[185]*Id.*
[186]Pl. Mot. at 11, dkt. 14.
[187]Def. Mot. at 10, dkt. 20.
[188]*Young*, 362 F.3d at 1001.
[189]Pl. Mot. at 13.

medication.[190] The Commissioner responds that it was reasonable for the ALJ to weigh the evidence this way, that her credibility findings are entitled to considerable deference, and that we may only overturn them if they are "patently wrong."[191]

We find that the ALJ's credibility determinations are patently wrong. The Seventh Circuit has held that when making a credibility finding, an ALJ must address credibility factors and why they are inconsistent or consistent with a claimant's testimony.[192] The ALJ did not do this. After listing all of Mr. Nix's limitations in daily living, the ALJ states that these limitations are based on his testimony of extreme pain but that there is no evidence of pain in the record.[193] To the contrary, there is evidence in the record that Mr. Nix suffered pain, even considerable pain. As such, the ALJ's reasoning that Mr. Nix's gait was normal, that he did not bring his cane to the hearing, that he did not display any signs of pain at the hearing, and that he is able to hold cigarettes with his hands is clearly erroneous.[194]

As to Mr. Nix's failure to seek psychiatric treatment, the Commissioner points out that the ALJ acknowledged that he did not seek it because of his lack of health insurance and was justified in finding that Mr. Nix was unable to demonstrate that he suffered from disabling mental illness.[195] The Commissioner cites to specific evidence from Mr. Nix's treating physician that indicates that Mr. Nix did not have any psychological limitations in February and June 2008.[196] These visits were between eighteen months and two years before the hearing. They are not, therefore, particularly compelling. However, we do agree that Mr. Nix's continued treatment for other conditions, but not

---

[190]Pl. Mot. at 14-15.
[191]Def. Mot at 11 (citing *Imani ex rel. Hayes v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986); *Powers*, 207 F.3d at 435).
[192]*Villanov v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).
[193]R. at 51-52.
[194]R. at 52.
[195]Def. Mot. at 11.
[196]Def. Mot. at 11.

psychiatric care, is telling. Therefore, we defer to the ALJ's finding regarding Mr. Nix's depression.

In regard to the ALJ discrediting Mr. Nix's testimony that he was asleep most of the time, but was "up and down throughout the night," we disagree. We find this testimony does not contradict itself. Therefore, on remand, the ALJ should revisit this part of her analysis.

**D.      The ALJ's Step Five Finding was proper.**

Finally, Mr. Nix argues that the ALJ's step five finding was erroneous because the VE testified that if the treating physician's RFC was given controlling weight, all work would be precluded.[197] He further argues that his depression and neuropathy preclude him from performing all work.[198] As the Commissioner points out, this is not a challenge to the ALJ's step five determination but to her RFC determination.[199] Accordingly, this issue will be resolved when the ALJ addresses the Listing requirement for Diabetes Mellitus as it relates to Mr. Nix's leg pain and when she reassesses her credibility determination. Once these are complete, she will be able to determine if the RFC requires revision. If it does, the step five analysis will be amended accordingly.

---

[197]Pl. Mot. at 15.
[198]*Id.*
[199]Def. Mot. at 13.

**V.      Conclusion**

For the reasons set forth above, Mr. Nix's Motion for Summary Judgment is granted [dkt. 13].

IT IS SO ORDERED.

_____
**U.S. Magistrate Judge**
**Susan E. Cox**

Date: <u>September 18, 2012</u>.